# 𝔗𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔩𝔞𝔦𝔪𝔰

No. 12-842C
(Filed: March 22, 2013)
**Opinion Originally Filed Under Seal on March 15, 2013**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * | | |
| | * | |
| PREFERRED SYSTEMS | * | |
| SOLUTIONS, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | **Bid Protest; Standing; Best Value** |
| | * | **Procurement; Deference to Technical** |
| THE UNITED STATES, | * | **Evaluation.** |
| | * | |
| Defendant, | * | |
| | * | |
| and, | * | |
| | * | |
| COMPUTER WORLD SERVICES | * | |
| CORPORATION, | * | |
| | * | |
| Defendant-Intervenor. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * | | |

*William T. Welch,* Reston, VA, for plaintiff.

*Michael d. Austin*, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery,* Principal Deputy Assistant Attorney General, and *Jeanne E. Davidson*, Director, for defendant.

*Lee Dougherty*, Alexandria, VA, for defendant-intervenor.

**O P I N I O N**

**FIRESTONE**, *Judge*

This post-award bid protest case arises from the United States Transportation Command's ("USTRANSCOM," "the government," or "the agency") contract award to Computer World Services Corporation ("CWS" or "defendant-intervenor") for a call center and associated support services.[1]  Preferred Systems Solutions, Inc. ("PSS" or "the plaintiff"), the incumbent contractor, seeks to set aside the award decision and require the government to either re-evaluate the existing proposals or rebid the contract.  The court granted CWS's motion to intervene on December 12, 2012.

Presently before the court are the United States' and CWS's motions to dismiss under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and the parties' cross-motions for judgment on the administrative record under RCFC 52.1.[2]  As discussed below, because the court concludes that PSS has standing to challenge the award, the court **DENIES** the defendant's and the defendant-intervenor's RCFC 12(b)(1) motions to dismiss.  However, because the plaintiff has not established that USTRANSCOM's decision to award the contract to CWS was arbitrary, capricious, an abuse of discretion, or contrary to law, the court **DENIES** the plaintiff's motion for

---

[1] USTRANSCOM provides air, land, and sea transportation to the Department of Defense. Administrative Record ("AR") 628.  The procuring agency is located at Scott Air Force Base in Illinois.  The call center historically has received nearly 22,000 requests for support per month, or approximately 723 calls per day, covering the complete range of USTRANSCOM's 22 transportation systems.  AR 541-42.

[2] Following an initial joint status conference, the parties agreed to consolidate the plaintiff's motion for a preliminary injunction with its cross-motion for judgment on the administrative record.  In the interim, PSS has continued to service the agency on a bridge contract that is set to expire on March 29, 2013.  Gov. Mot. 27.

judgment on the administrative record and **GRANTS** the United States' and the

defendant-intervenor's cross-motions for judgment on the record.

## I.    STATEMENT OF FACTS

### a.  Solicitation and Evaluation Criteria

On April 30, 2012, the agency issued a Request for Quote ("RFQ") on behalf of

the Military Surface Deployment and Distribution Center ("SDDC")[3] to acquire a variety

of technical services, including a Tier 1 Help Desk/Call Center, support for users of

Oracle's Siebel software, and Independent Verification and Validation ("IV&V").[4]  AR

573, 615, 632.

Offerors were advised that proposal evaluation would be conducted in accordance

with FAR 8.405-2(d),[5] and that award would be made to the offeror whose proposal

complied with the RFQ's requirements and that provided the best value to the

government, price and non-price factors considered.  AR 574.  Award was to be based on

three criteria: Mission Capability, Past Performance, and Price.  AR 574.  The RFQ stated

that the non-price factors were equal in importance, and when combined were

significantly more important than price.  AR 574.  As such, the RFQ expressly

---

[3] The SDDC provides global surface deployment and distribution services mainly for military purposes.  It is the Army component of the USTRANSCOM.  AR 628.

[4] IV&V involves testing software applications to determine the acceptability of the application and whether or not the software performs the requirements as specified.  See AR 897.

[5] FAR 8.405-2(d) provides, inter alia, that the agency must evaluate all responses using the evaluation criteria provided to the offerors.  In making the award to the best-value offeror, the agency "is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is reasonable."  Id.

contemplated that it would be possible for the government to award the contract "to a higher-rated, higher-[p]riced offeror where the decision is consistent with the evaluation factors." AR 617.

Each offeror's Mission Capability was to be evaluated based on two coequal sub-factors: Technical Approach and Staffing. AR 577. Specifically, the government planned to identify the "strengths" and/or "weaknesses" of each quote that would affect the offeror's ability to perform as required under the contract.[6] The RFQ stated that strengths and weaknesses of an offeror's Technical Approach would be based on (1) the adequacy of the offeror's approach to accomplishing the effort at the requisite level of quality; and (2) whether "the Offeror clearly and reasonably communicate[d] an understanding of the effort that is consistent with the [performance work statement ("PWS")] requirements."[7] AR 570. With regard to the Staffing sub-factor, offerors were required to submit staffing plans and matrices that linked personnel resources to each task in the PWS. AR 577. The government planned to identify Staffing strengths and weaknesses based on the extent to which the proposal provided a realistic and stable staffing approach with types and numbers of positions sufficient to ensure the successful performance of the PWS requirements. AR 577.

---

[6] Strength was defined as "[a]n aspect of an Offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be [advantageous] to the Government during contract performance." AR 574. Weakness was defined as "a flaw in the proposal that increases the risk of unsuccessful contract performance." AR 574.

[7] The PWS was attached as an enclosure to the RFQ. AR 627-77.

The second non-price factor, Past Performance, was to be evaluated as an overall measure of the government's confidence in the bidder's ability to successfully perform the required effort based on relevant recently-performed efforts in areas such as help desk support.  AR 574-76.  Offerors were instructed to provide no more than four Past Performance submissions of government or commercial contracts which they considered relevant.  AR 574.  The RFQ stated that the government would consider the Past Performance information supplied by each offeror, as well as any additional Past Performance information obtained by the government.  AR 576.  After the government determined the relevancy of each Past Performance effort, the agency would assign an overall Past Performance confidence assessment rating.[8]  AR 575-76.

To evaluate the third factor, Price, offerors were required to provide a price "for the base period and all option periods using the rates in their existing [General Services Administration ("GSA")] Federal Supply Schedule 70, Category 132-51 Contract."  AR 578.  The offerors were further required to provide a breakout of the proposed hours associated with each proposed labor category, as well as pricing for phone lines.  AR 620. Each offeror proposing a discount on its current GSA schedule labor rates was also required to "provide an explanation to assist the Government's price reasonableness

---

[8] The highest possible Past Performance rating was "Substantial confidence," which indicated that "the government has a high expectation that the offeror will successfully perform the required effort."  The second highest rating, "Satisfactory confidence," indicated that "the government has a reasonable expectation that the offeror will successfully perform the required effort."  The third highest rating, "Limited confidence, indicated that "the government has a low expectation that the offeror will successfully perform the required effort."  In addition, offerors could be assessed as having "no" or "unknown" confidence scores.  AR 619.

analysis to ensure the Government has confidence that the offeror understands the requirement."  AR 578.

The RFQ stated that pricing would not be rated, and would instead be evaluated for reasonableness and realism.  AR 574, 578.  As to realism, proposals would be analyzed to determine whether they demonstrated a "clear understanding of, and sound approach to" satisfying the RFQ's requirements.  AR 578.  The RFQ further stated that, "[w]hen an offer is evaluated as unrealistically low this fact will be identified and considered in the evaluation of all areas of the offeror's quote as deemed necessary by the Government."  AR 578-79.  To support the price evaluation, the government established an independent government cost estimate ("IGCE") in the amount of $33,002,931.  AR 1935.

### b.  Proposal, Evaluation, and Award

Five offerors—PSS, CWS, Computer Sciences Corporation ("CSC"), Harris IT Services Corporation ("Harris"), and Superlative Technologies, Inc. ("SuprTEK")— responded to the RFQ.  AR 1318.  Each proposal was independently evaluated by a Source Selection Evaluation Team ("SSET"), AR 1318, in accordance with the format outlined in the RFQ.  AR 1318-20.  Following the initial evaluations, the SSET identified each offeror's proposal strengths, weaknesses, significant weaknesses, and deficiencies.  AR 1320-24.  The SSET used two worksheets—one for the Staffing sub-factor and one for the Technical Approach sub-factor—to document the Mission Capability evaluation for each proposal.  AR 957-59 (Harris), 1021-25 (PSS), 1068-70 (SuprTEK), 1129-32 (CSC), 1260-62 (CWS).  For each strength or weakness, the SSET cited the relevant

portion of the offeror's proposal, identified the strength or weakness, and described the benefit or impact of the strength or weakness.  For example, the SSET identified as a Technical Approach strength the fact that CSC's proposal indicated that it was Information Technology Information Library ("ITIL") certified.  AR 1130.  The SSET concluded that "ITIL Certification reduces cost, provides repeatable results and increased customer satisfaction by encompassing industry best practices."  AR 1130.  Similarly, the SSET identified a Staffing weakness in SuprTEK's proposal because "proposed overall labor hours for Task 3 subtask 9 appears to be excessively high."  AR 1068.  The impact of this weakness was that, "[h]ours do not appear proportionate to the task; therefore additional labor hours allocated to ETA user account administration could generate unnecessary costs."  AR 1068.

Because significant weaknesses or deficiencies were identified for each offeror, the SSET was unable to make an overall assessment regarding the realism of each proposal.  AR 1320-24.  As a result, the SSET determined that each offeror would remain in the competitive range for the purpose of holding discussions.  AR 1320-21.  Based upon the competitive range determination, the contracting officer, who was also the Source Selection Authority ("SSA"), prepared individual written discussion memoranda specifically tailored to each offeror's proposal, including PSS and CWS.  AR 954, 1016, 1065, 1125, 1256.

The SSA engaged in discussions with each offeror, two of which are particularly relevant to the case at bar.  See AR 1372-86 (SSA summary of discussions).  The Mission Capability evaluation of PSS had initially identified a "significant weakness" under the

Technical Approach sub-factor because PSS's proposal "did not address staffing or address a technical approach for the additional G6 OIS support."[9]  AR 1025, 1323.  The agency concluded that, due to this weakness, it could not fully evaluate the task.  AR 1025.  In discussions, PSS explained that its Technical Approach for these subtasks was based on its existing practices and its currently employed Siebel team.  AR 1477.  PSS also noted that it had revised its Technical Approach in its resubmitted proposal.  AR 1477.  As a result of this clarification, the SSA concluded that PSS had resolved the concern, and subsequently removed the significant weakness from PSS's Technical Approach evaluation.  AR 1477.

In its discussions with CWS, the agency requested, among other things, an explanation of how CWS could afford to offer such significantly discounted labor rates for personnel who would be staffing the call center.[10]  AR 1436.  In response, CWS explained that it based its salary estimates using a purchased tool, the Economic Research Institute's Salary Assessor, and that CWS had compared its data with other commercial sites.  AR 1436.  Moreover, CWS had determined that much of the work to be performed was "habitual, scripted call center support which includes data entry, referencing of the Knowledge Database and providing directed guidance to SDDC users."  AR 1436.  As such, CWS had concluded that "[t]he nature of this task does not require the higher level technical background that our original GSA labor rates for [this labor category] are

---

[9] The specific subtasks referenced by the agency were Siebel Software Support, Customer Self-Service Website, and Siebel Ticketing Software Training.  AR 432-33, 1025.

[10] The government sought explanation for CWS's initial proposal to discount its labor rate for the category "Customer Service Representative I" by 44%.  AR 1263.

intended . . . ."  AR 1436.  Based on this response, the SSA concluded that CWS had "provided the required needed [rationale] for the GSA Schedule discounted rate for CSR I to help the Government's price reasonableness analysis."  AR 1436.

On August 6, 2012, following discussions, each offeror submitted final proposals. See AR 1489, 1500, 1511, 1519, 1524.  The SSET then reevaluated each proposal, to include its evaluation of price completeness, reasonableness, and realism, in order to make a best value recommendation.  AR 1545-47, 1559-62.  Following the format specified in the RFQ, the SSET first discussed each offeror's Past Performance, Mission Capability (i.e., Staffing and Technical Approach), and Price.[11]  AR 1559-62.  The results of the SSET's analysis are reflected in the table, below:

| Offeror | Rank | Past Performance | PRICE (all prices determined reasonable and appropriate) | Mission Capability (all strengths determined to provide equal benefit) |
|---------|------|------------------|-----------------------------------------------------------|--------------------------------------------------------------------------|
| IGCE | N/A | N/A | $33,002,931.00 | N/A |
| CWS | First | Satisfactory Confidence | $12,973,833.76 | 1 Strength (ITIL) |
| CSC | Second | Substantial Confidence | $20,130,031.71 | 1 Strength (ITIL) |
| PSS | Third | Substantial Confidence | $21,883,877.04 | 1 Strength (low turnover) |
| Harris[12] | Fourth | Satisfactory Confidence | $15,184,129.00 | 1 Strength (ITIL) |
| SuprTEK | Fifth | Limited Confidence | $26,642,348.05 | 1 Strength (ITIL) |

Based upon its review of the proposals, the SSET recommended that CWS "represents the best value to the Government."  AR 1562.  According to the SSET:

[11] The SSET used the same evaluation worksheets as it had for the initial evaluation for documenting proposal strengths and weaknesses.

[12] The record indicates that Harris' Past Performance confidence rating was adjusted from "Limited" confidence to "Satisfactory" confidence after the initial ranking by the SSET, but before consideration by the SSA.  AR 1563-66.  This revision appears to have been due to the delayed receipt of past performance information due to delay by Harris' references. The improved past performance score likely explains why the SSET initially ranked Harris fourth, AR 1547, and the SSA ranked Harris second.  See AR 1467, 1553.

> CWS demonstrated Very Good to Exceptional Past Performance ratings,
> resulting in a Satisfactory Performance Confidence Assessment rating,
> meaning that the SSET has a reasonable expectation that CWS can
> successfully perform the required effort. Additionally, CWS quoted the
> lowest total price and was considered to be realistic to their Technical
> Approach.

AR 1562. Although the SSET recognized that CSC and PSS had both received higher

Past Performance ratings than CWS, the SSET concluded that "the trade-off of

Substantial confidence to Satisfactory confidence did not merit the substantial price

premium of CSC and PSS." AR 1561-62.

Following the SSET evaluation, the SSA prepared a "Best Value Decision

Document," which adopted the SSET's recommendation that CWS represented the best

value to the government. AR 1548, 1556. In this document, the SSA compared CWS to

each of the other bidders with regard to the RFQ's three evaluation criteria.[13] AR 1548-

57. In its comparison of PSS's and CWS's proposals, the SSA explained why, despite

receiving a higher Past Performance rating, PSS did not receive the award:

> CWS' overall price quote is 27% or $8,910,043.28 less than PSS, ranked
> #4, with Past Performance Substantial confidence and Mission Capability
> one (1) strength/ no weaknesses/ significant weaknesses/ deficiencies. PSS
> was rated with a higher Past Performance confidence than CWS. PSS'
> strength of a low employee turnover rate of three (3) percent provides a
> benefit essentially the same in merit to CWS' strength of ITIL certification.
> Although PSS was determined to have Substantial confidence ratings in

---

[13] In addition to comparing CWS to each of the other bidders, the SSA compared all of the
unsuccessful bidders with each other as if CWS had not submitted a proposal. In comparing PSS
to CSC, the SSA noted that both companies received the same Past Performance rating
(Substantial confidence). The SSA also concluded that "PSS' strength of a low employee
turnover rate of three (3) percent provides a benefit essentially the same in merit to CSC's
strength to utilize personnel with ITIL certification." AR 1555-56. Thus, the SSA concluded
that "[t]he non-price factors for both of these Offerors are equal and price is the discriminating
factor." AR 1556.

Past Performance, their higher rated Past Performance does not warrant the
premium in pricing required to award to them above CWS' Satisfactory
confidence rating.  When comparing PSS' two (2) Past Performance
references and CWS' three Past Performance references, the difference is
that PSS provided Very Relevant ratings in four (4) of four (4) performance
areas as compared to CWS' Very Relevant ratings in three (3) of four (4)
performance areas.  This difference does not provide sufficient benefit to
the Government to warrant the 27% price premium required to award to
PSS.

AR 1554.

With regard to Past Performance, the SSA reached essentially the same

conclusions as the SSET.  AR 1549-51.  Specifically, PSS and CSC both received ratings

of Substantial Confidence, CWS and Harris received ratings of Satisfactory Confidence,

and SuprTEK received a rating of Limited Confidence.  The SSA also included detailed

findings as to the relevance and recency of the Past Performance submissions by each of

the offerors.  AR 1549-51

The SSA also reached substantially similar conclusions as the SSET with regard to

Mission Capability.  Specifically, each offeror was assessed a single strength (and no

weaknesses), all of which were considered to be of equal benefit to the government.  AR

1551.  The agency granted a single strength in the Staffing sub-factor to (1) CSC and

CWS for their ITIL certification, (2) PSS for low employee turnover rate; and (3) Harris

and SuprTEK for their use of best practices in ITIL.  AR 1575-84.

In evaluating price, specifically, the SSA concluded that all five offerors provided

quotes that were more realistic than the IGCE.[14]  AR 1551-53.  Of particular relevance,

---

[14] Of the five bidders, only CSC submitted a bid that did not include discounted rates.  AR 1552.

the SSA concluded that although CWS was offering a 55% discount from its labor rates

for certain categories, the discount was consistent with escalation rates within GSA FSS

IT-70 contracts, and was fair and reasonable based on the United States Department of

Labor National Compensation Survey and statistics for the relevant St. Louis MO-IL

region.  AR 1552.

Based on this analysis, the SSA's final rankings of the offerors in the competitive

range can be summarized as follows:

| Offeror | Rank | Past Performance | PRICE (all prices determined reasonable and appropriate) | Mission Capability (all strengths determined to provide equal benefit) |
|---------|------|------------------|-----------------------------------------------------------|------------------------------------------------------------------------|
| CWS | First | Satisfactory Confidence | $12,973,833.76 | 1 Strength (ITIL) |
| Harris | Fourth | Satisfactory Confidence | $15,184,129.00 | 1 Strength (ITIL) |
| CSC | Second | Substantial Confidence | $20,130,031.71 | 1 Strength (ITIL) |
| PSS | Third | Substantial Confidence | $21,883,877.04 | 1 Strength (low turnover) |
| SuprTEK | Fifth | Limited Confidence | $26,642,348.08 | 1 Strength (ITIL) |

AR 1556.  In his final analysis of all offerors in the competitive range, the SSA

concluded:

> My assessment considered the fact that non-price factors are considered
> significantly more important than price; however, there is not sufficient
> merit in the other quotes that would substantiate the price premium quoted
> by the next best offerors.  Although two offerors, CSC and PSS, were
> determined to have Substantial confidence ratings in Past Performance,
> their higher rated Past Performance does not warrant the premium in
> pricing required to award to them above CWS' Satisfactory confidence
> rating.  CWS' proposal is the lowest overall priced offeror 6.7% or
> $2,210,295.24 to 41.42% or $12,668,514.29 less than the other four (4)
> offerors, making CWS' quote clearly the best value offeror, price and non-
> price factors considered.

AR 1556.  Award was made to CWS on August 17, 2012.  AR 1649.

### c.  GAO Bid Protest

On August 27, 2012, PSS filed a bid protest at the Government Accountability
Office ("GAO") challenging the award to CWS.  AR 1885-95.  PSS made substantially
similar allegations as it does before this court.  Specifically, PSS argued that the
government had "violated procurement regulations" when it failed to perform (1) a
proper price realism analysis and (2) a reasonable Technical Approach evaluation of the
PSS Mission Capability proposal and the CWS proposal.  AR 1885.   In particular, PSS
challenged the agency's refusal to fully recognize as Staffing and Technical Approach
strengths all of the experience and expertise of its proposed staff.  GAO denied PSS's
protest on November 30, 2012.  AR 1938.  The GAO ruled that PSS's allegations
basically amounted to a disagreement with "the agency's judgment of the respective
merits of the vendors' quotations."  AR 1938.

### d.  The Instant Litigation

PSS timely filed this action on December 6, 2012.  Following a joint status
conference, the court ordered the parties to consolidate briefing so as to address both the
parties' cross-motions for judgment on the administrative record and the plaintiff's
request for preliminary/permanent injunctive relief.  Briefing was completed on February
15, 2013 and argument was heard on March 13, 2013.

## II.   DISCUSSION

### a.  The Government's and the Defendant-Intervenor's  Motions to Dismiss

#### i.  Standard of Review

This court has jurisdiction "to render judgment on an action by an interested party
objecting to . . . a proposed award or the award of a contract or any alleged violation of

statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). It is well established that the plaintiff has the burden of establishing subject matter jurisdiction under this section. See Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011); Knight v. United States, 65 F. App'x 286, 289 (Fed. Cir. 2003). The court will accept as true the plaintiff's well-pleaded factual allegations, and "draw all reasonable inferences in its favor." Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1338 (Fed. Cir. 2006). If, however, the government challenges the jurisdictional allegations in the pleadings, the court will deem the government as having challenged the factual basis for the court's jurisdiction. N. Hartland, L.L.C. v. United States, 309 F. App'x 389, 391-92 (Fed. Cir. 2009). In such a case, the court will only accept the uncontroverted factual allegations, and make findings as to those jurisdictional facts in dispute. Id.

In order to have standing under this court's bid-protest jurisdiction, the plaintiff must be an "interested party." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). To make the necessary showing, the plaintiff must demonstrate that (1) it was an actual or prospective bidder; and (2) it possesses a direct economic interest that would be affected by the contract award. Id. Because the government and the defendant-intervenor do not dispute that PSS was an actual bidder, the court turns to whether the plaintiff has demonstrated the requisite direct economic interest.

### ii. PSS Has Standing to Challenge the Award

The government and CWS contend that because PSS had no chance of award, PSS cannot demonstrate the requisite direct economic injury to establish standing. Gov. Mot.

16; Intervenor Mot. 5.  Specifically, the government and the defendant-intervenor assert

that, even assuming that (1) PSS is credited with at least one additional strength and (2)

CWS is penalized for having an unrealistic proposed price, at least two other

contractors—CSC and Harris—would still be next in line for the contract.  Gov. Mot. 16.

The government relies on <u>Impresa Construzioni Geom Domenico Garufi v. United States</u>,

238 F.3d 1324, 1334 (Fed. Cir. 2001) for the proposition that "protesters who . . . finished

lower than second after evaluation do not have standing to protest the procurement."

Gov. Mot. 15.  In such circumstances, the government argues, PSS cannot be said to have

had a substantial chance of receiving the contract award and therefore lacks standing.[15]

PSS responds by arguing that the existence of higher ranked offerors does not

necessarily deprive a protester of standing.  Pl. Mot. 3-4.  PSS relies on <u>Data Gen. Corp.</u>

<u>v. Johnson</u>, 78 F.3d 1556, 1562 (Fed. Cir. 1996) for the proposition that the Federal

Circuit does not require a protester to show that, "but for the alleged error, the protester

would have been awarded the contract."  Pl. Reply 2.  Rather, the protester need only

show that, had the evaluation been proper, the protester would have had a substantial

chance to win the award.  Pl. Mot. 2.  Here, PSS alleges that the agency erred in its

evaluation in many respects.  PSS argues that it should have been credited with strengths

for (1) the Emergency Alternative Call Center ("EAC"), <u>see</u> Compl. ¶ 49; and (2)

---

[15] CWS makes substantially the same argument, noting that PSS was ranked third by the SSET
and fourth by the SSA.

specialized knowledge of legacy systems by its existing staff.[16]  See id. ¶¶ 48, 50-51.

PSS also alleges that the government erroneously granted CWS a strength in Staffing.  Id.

at ¶ 52.  Further, PSS contends that the government conducted an improper price realism

analysis of CWS's proposal.  Id. at ¶ 53.  PSS argues that if the proposals were properly

evaluated, PSS's proposal would receive a much higher rating, such that it would have a

reasonable chance of being found to be the best value to the government.  Pl. Mot. 3-4.

    The court agrees that PSS has demonstrated a sufficiently direct economic interest

to establish standing.  To have a "direct economic interest" means that the plaintiff must

show that it had a substantial chance of receiving the contract.  See Comint Sys. Corp. v.

United States, 700 F.3d 1377, 1383 (Fed. Cir. 2012); Rex Serv. Corp. v. United States,

448 F.3d 1305, 1308 (Fed. Cir. 2006).  This requirement does not, however, mean that a

protester must be "next in line" to invoke this court's jurisdiction.  The government's

reliance on Impresa in this regard is misplaced.  The section of Impresa cited by the

government merely reviews prior cases—one of which involved a protester who ranked

lower than second—in which the Federal Circuit had held that the protester lacked

standing.  The specific case relied on by the Circuit in Impresa, International Business

Machines Corp. v. United States, 892 F.2d 1006 (Fed. Cir. 1989) ("IBM"), involved a

sealed-bid procurement for electronics where the court held that the seventh-ranked

---

[16] As reflected in this opinion, the court has endeavored to isolate the specific factual allegations of government error from PSS's duplicative or general claims of dissatisfaction with the SSET and SSA evaluations.  For example, PSS claims that the government failed to (1) identify CWS's price proposal as unrealistically low, Compl. ¶ 35; and (2) assess a weakness to CWS for demonstrating a lack of RFQ requirements in light of the extremely low price, Compl. ¶ 53.  In essence, however, these claims simply allege an improper price realism analysis.

bidder (of ten) did not have standing.  The solicitation at issue in the case at bar, which

involves a firm-fixed price contract awarded to the best value offeror, is easily

distinguished from the solicitation in IBM.  In making its best value determination, the

SSA concluded that PSS's Past Performance rating was not enough to justify its price

premium.  However, PSS identifies a series of objections to that tradeoff conclusion and

asks that the SSA's evaluation be set aside and redone.  In such circumstances, the

government's assertion that Impresa precludes this court from finding standing is without

merit.

        In this context, the court agrees that a plaintiff does not have to establish that, but

for the alleged error, it would have won the contract.  Alfa Laval Separation, Inc. v.

United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999).  The "substantial chance of award"

requirement is instead satisfied where, but for the government's alleged error, the

protestor would have been "within the zone of active consideration."  Allied Tech.

Group, Inc. v. United States, 94 Fed. Cl. 16, 37 (2010), aff'd, 649 F.3d 1320 (Fed. Cir.

2011).  "In other words, the protestor's chance of securing the award must not have been

insubstantial."  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319

(Fed. Cir. 2003).  It is because PSS's chance for award would not be insubstantial that the

court is persuaded that the plaintiff has demonstrated that it has standing.  Despite

ranking fourth out of five offerors, PSS was in the competitive range, AR 1320-21, and

therefore within the zone of active consideration.  More importantly, if, as PSS alleges, it

should have received at least two additional strengths and the Price evaluation of CWS

were done properly, all of the agency's ratings would need to be redone, and a new best

value determination made.  It is in this best value context that PSS has demonstrated that it would have had a substantial chance of receiving the award.  See Info. Tech., 316 F.3d at 1319.  Accordingly, the government's and the defendant-intervenor's motions to dismiss under RCFC 12(b)(1) are **DENIED**.

### b.  Cross-Motions for Judgment on the Administrative Record

#### i.  Standard of Review

In deciding bid protest cases, the court applies the standards of the Administrative Procedure Act, 5 U.S.C. § 706 (2012).  See 28 U.S.C. § 1491(b)(4).  A procurement decision must be upheld unless the court determines that the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under RCFC 52.1, the court makes factual findings "from the record evidence as if it were conducting a trial on the record."  Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005).  This review is necessarily limited, as it is well established that "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government."  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).  As such, procurement decisions invoke a deferential basis of review, see Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009), and that deference is the greatest where, as here, the court reviews the propriety of an agency's technical evaluations.  See Atl. Diving Supply, Inc. v. United States, 107 Fed. Cl. 244, 250 (2012) (quoting Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl.

384, 395 (2005)).  The Federal Circuit's decision in <u>Banknote</u> described the court's task

as follows:

> Under the APA standard . . . a bid award may be set aside if either (1) the
> procurement official's decision lacked a rational basis; or (2) the
> procurement procedure involved a violation of regulation or procedure. . . .
> When a challenge is brought on the first ground, the test is whether the
> contracting agency provided a coherent and reasonable explanation of its
> exercise of discretion, and the disappointed bidder bears a 'heavy burden'
> of showing that the award decision had no rational basis.

<u>Banknote</u>, 365 F.3d at 1351 (citations omitted).

It is against this backdrop that the court will review the merits of PSS's case.  As

discussed <u>supra</u>, PSS's allegations regarding the government's failure to conduct a proper

best value evaluation fall into three basic categories: (1) the agency's failure to properly

evaluate PSS's Mission Capability proposal; (2) the agency's failure to properly evaluate

CWS's Mission Capability Proposal; and (3) the agency's failure to properly evaluate

CWS's Price proposal.  Each will be examined in turn.

### ii.  The Agency's Evaluation of PSS's Mission Capability Proposal

The plaintiff primarily contends that the agency acted arbitrarily and capriciously

and abused its discretion because the Mission Capability "evaluation recognized only a

single strength for the PSS proposal in staffing and failed to recognize several instances

in which the PSS proposal provided significant advantages in areas that were specifically

related to the requirements of the RFQ."  Compl. ¶ 45.  PSS identifies several aspects of

its proposal that PSS believes should have received strengths, such as its proposed EAC,

Pl. Mot. 20-25, and the knowledge of legacy systems and high customer satisfaction of its

proposed incumbent staff.[17]  Pl. Mot. 11, 23.  The plaintiff further argues that because

these "strengths" are not mentioned in the agency's Technical Approach evaluation

sheets, the court should find that the agency failed to perform a proper Technical

Approach evaluation.  Pl. Mot. 23 ("The fact that there is no comment or discussion of

any of these points is simply unreasonable . . . . [and] shows the arbitrariness of the

evaluation.").  In response, the government and defendant-intervenor argue that PSS's

argument essentially boils down to a disagreement over how its proposal was scored,

which is not a proper basis to overturn an award.  Gov. Mot. 25; Intervenor Mot. 9.

The court concludes that the government was not arbitrary or capricious and did

not abuse its discretion by not crediting PSS with additional strengths for its Mission

Capability proposal.  The vast majority of the strengths that PSS claims to have been

wrongfully denied were, in fact, credited in either PSS's Staffing sub-factor evaluation or

its Past Performance evaluation.[18]  For example, to the extent that PSS deserved a

---

[17] The plaintiff also appears to claim that it should have been credited for as many as ten additional strengths under the Technical Approach sub-factor for the following aspects of its proposal: (1) PSS "designed and custom built the current network architecture for the USTRANSCOM's Service Response Center," Pl. Mot. 20; (2) PSS's existing network has achieved 99.999% uptime, id.; (3) PSS based the proposed network architecture on the "same secure, robust and redundant framework" used on the predecessor contract, id. at 20; (4) PSS has performed the predecessor contract "successfully" for 10 years, id.; (5) PSS proposed the same staff to perform the new contract, id. at 21; (6) PSS's performance on the predecessor contract "supported the ability to absorb a 300% increase in call volume since 2009," id. at 24; (7) PSS proposed improving on its past performance by using commercial best practices in support of the EAC, id.; (8) PSS "propose[d] its existing IV&V process that is unique to this contract and is diagramed in the proposal," id.; (9) "PSS offered its 58 person profession[al] staff, which has a documented history of 98% first call resolution," id. at 25; and (10) PSS proposed "a secure private cloud utilizing virtual servers with back-end scalable and redundant storage," id.

[18] At oral argument the plaintiff asserted that the agency's failure to credit PSS with a strength for its proposed EAC was evidence that the agency's Technical Approach evaluation was

strength because of its proposed staff's knowledge of legacy systems, this strength was already recognized under the Staffing evaluation, in which the SSET wrote that a strength was appropriate because of PSS's staff's "knowledge related to the uniqueness of the supported applications." AR 1541. Similarly, PSS received acknowledgment for its "exceptional" performance providing services under the predecessor contract when it received a "Substantial confidence" rating for Past Performance. AR 1037. Moreover, to the extent that the plaintiff is suggesting that, by virtue of its incumbency and superior past performance rating, it was necessarily entitled to a better Technical Approach rating, that suggestion must be rejected. See Pl. Mot 26; Pl. Reply 7-9. This court has previously determined in similar contexts that it is not irrational for the government to credit an offeror with the highest possible past performance rating and less than the highest possible technical rating. See Atl. Diving Supply, Inc. v. United States, 107 Fed. Cl. 244, 248, 251-54 (2012).

Similarly, the plaintiff's suggestion that a new evaluation is required because "the Agency did not and could not explain why these advantages and benefits are not strengths," Pl. Mot. 22, must be rejected. Again, as this court has noted in other contexts, an agency official exercising discretion need not address every piece of evidence presented in its decision. Rebosky v. United States, 60 Fed. Cl. 305, 312 (2004). It is a well-understood principle of administrative law that "the failure to mention certain

---

arbitrary and capricious. The record reflects, however, that the proposed EAC was only used twice in nine years and was not a mission-essential aspect of the contract. AR 1966. Therefore it was not irrational for the government to decide not to credit PSS with an additional strength.

evidence [does not mean] that it was not considered, nor does it follow that an explanation is incomplete unless it dutifully lists all the evidence . . . examined." Butte Cnty., Cal. v. Hogen, 609 F. Supp. 2d 20, 30 (D.D.C. 2009) (quoting Lorion v. U.S. Nuclear Regulatory Commission, 785 F.2d 1038, 1042 (D.C. Cir. 1986)).

The record here also demonstrates that, contrary to the plaintiff's contentions, the SSA and SSET duly considered PSS's Mission Capability proposal and rationally assessed a single strength. The copy of PSS's proposal that was reviewed by the agency includes handwritten review notes that allow this court to conclude that the agency did, in fact, review and consider the entirety of PSS's Technical Approach proposal prior to making its decision. AR 2279-86. This conclusion is bolstered by record evidence of the agency's prior discussions with PSS, in which the SSA sought additional information for the express purpose of conducting a thorough Technical Approach evaluation of PSS's proposal. Moreover, PSS's staffing sub-factor evaluation sheet did contain a brief narrative concerning the benefit of PSS's low turnover rate, again confirming that the government had considered the entirety of PSS's proposal.[19] AR 1541. When these facts are considered alongside the extensive discussion in the trade-off analysis by both the SSET and the SSA, there is little doubt that the government fully considered the proposals and drew reasonable conclusions from the evidence.

---

[19] The worksheet identifies as a Staffing strength that PSS "proposes a low employee turnover rate; 3% as compared to an industry average of 30%. . . . The low turnover rate of [customer service representatives] would allow for improved customer support due to the retention of [customer service representatives] with knowledge related to the uniqueness of the supported applications." AR 1541.

### iii.  The Agency's Evaluation of CWS's Mission Capability Proposal

The plaintiff complains that it was "inconsistent with the stated evaluation criteria and unfair to PSS" for CWS to receive a strength for Staffing because (1) CWS did not offer a full staff that could handle all the customer service metrics outlined in the RFQ at contract initiation, and (2) CWS has never performed this type of work and had no existing employees with any experience in performing this specific work.  See Compl.  ¶¶ 45-46, 52.  The plaintiff argues that CWS's Mission Capability proposal failed to address how it would recruit sufficient staff to execute the contract at labor rates that CWS concluded were unrealistically low.  Pl. Mot. 27.  On this basis, PSS asserts that the government's evaluation of CWS's Mission Capability proposal was arbitrary, capricious, and an abuse of discretion.[20]  Pl. Mot. 29.  In response, the government and CWS argue that PSS simply disagrees with the Mission Capability ratings determined by the agency, which is not a proper basis for relief.  Gov. Mot. 25; Intervenor Mot. 9-10.

Again, the court agrees with the government and the defendant-intervenor.  There is ample evidence in the record from which the evaluators could reasonably conclude that CWS possessed—and had a plan to acquire—staff with the requisite technical expertise.  In its proposal, CWS notes that it would "work to transition any high value incumbents while also recruiting new staff to our contract.  We have already actively begun recruiting

---

[20] In the brief supporting its motion for judgment on the administrative record, PSS also alleged that because CWS violated the page limitation for its Mission Capability proposal, CWS failed to demonstrate that it met certain security requirements in the RFQ.  See Pl. Mot. 28.  Because the plaintiff subsequently withdrew this argument, the court need not reach this issue.  See Pl. Reply 2, n.1.

efforts and have built a database of over 50 prescreened candidates." AR 1859.

Moreover, at least 24% of CWS's proposed staff were ITIL V3 foundation certified, AR

1834, which was recognized as a benefit to the government.[21] AR 1551.  In light of this

record evidence, the court cannot agree with PSS's contention that CWS's strength was

unsupported and lacked a rational basis.  The court thus finds that PSS has failed to

establish that the SSA's decision concerning CWS's strength in Staffing was arbitrary,

capricious, or an abuse of discretion.

### iv.  The Agency's Evaluation of CWS's Price Proposal

Finally, the plaintiff argues that CWS should have been assessed a weakness

because of its "extremely low proposed price" on the grounds that CWS did not

understand the RFQ requirements and/or the degree of complexity and sophistication of

staff that would be required to perform the work.  Compl. ¶ 53.  PSS notes that the

proposed price was more than 40% lower than the incumbent's (PSS) pricing, Compl. ¶

41, 60% below the IGCE, Pl. Reply 12, and included discounts for some labor categories

of up to 54%  off CWS's GSA rate.  Pl. Reply 12.  As a result, the plaintiff speculates,

CWS would have been required to reduce current staffing levels by an equivalent 40%, or

to reduce salaries.  Compl. ¶ 53.  The failure to recognize this risk, according to the

plaintiff, makes the agency's Price evaluation arbitrary and capricious.

---

[21] That the ITIL certification was considered valuable is evidenced by statements by the SSET in
reviewing CSC's initial proposal, where it wrote "one strength is because the company is
Information Technology Infrastructure Library (ITIL) certified, which reduces cost, provides
repeatable results and increases customer satisfaction by encompassing industry best practices."
AR 1321.

In response, the government and CWS contend that that the agency conducted a proper price realism analysis.  Relying on <u>Ceres Environmental Services, Inc. v. United States</u>, 97 Fed. Cl. 277, 303 (2011), the government argues that an agency has broad discretion to conduct a price realism analysis and to assess the potential risks associated with a proposed price.  Gov. Mot. 22. The government notes that in this case, the SSA expressly concluded that despite the variances between each offeror's proposed labor mix, the overall hours and skill mixes were determined to be "more realistic than the hours estimated in the ICGE."  Gov. Mot. 23-24 (quoting AR 1551).  CWS also argues that the SSA, rather than ignoring the significance of the discount offered by CWS, specifically considered the issue and consulted a variety of relevant sources before concluding that CWS's discount was fair and reasonable.  Intervenor Mot. 11 (citing AR 1552).

The court agrees with the government and defendant-intervenor that the plaintiff has failed to show that the SSA's price evaluation was arbitrary, capricious, or an abuse of discretion.  To the contrary, the record shows that the agency was attuned to the potential risk of an unrealistically low price proposal from CWS, and actively sought clarification to resolve that risk during discussions.  As CWS points out, the SSA consulted multiple sources of evidence to determine whether CWS's discounts were fair and reasonable, including escalation rates within GSA FSS IT-70 contracts, the U.S. Department of Labor National Compensation Survey, and statistics for the relevant St. Louis MO-IL region.  AR 1552.  The plaintiff has not attacked the propriety of analyzing rates in this fashion, and the court has no basis for doing so <u>sua sponte</u>.  Rather, the

plaintiff asserts that, because CWS's price was less than the incumbent's, it must not have been realistic.  Pl. Mot. 33 (such a significantly lower price than the incumbent "should have raised significant concerns over whether CWS understood the level of coverage under the scope of the [PWS]").  Although PSS might believe that CWS's discount posed a risk to the government, this court cannot second-guess the agency where, as here, the SSA thoughtfully recognized the potential for risk, consulted appropriate sources, and only then concluded that the offeror's price was reasonable and realistic.  In such circumstances, the price realism determination must be upheld.[22]

## III.   CONCLUSION

For the forgoing reasons, the plaintiff's motion for judgment on the administrative record is **DENIED** and the government's and CWS's cross-motions are **GRANTED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[22] In such circumstances the court has no occasion to evaluate whether injunctive relief is appropriate.  Similarly, because the court finds that the government's actions were not arbitrary and capricious, the court does not reach the government's arguments regarding PSS's failure to show prejudice.